UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RACHEL BERVEN, et al.,<br><br>              Plaintiffs,<br><br>vs.<br><br>LG CHEM, LTD.,<br><br>              Defendant. | CASE NO.: 1:18-CV-01542-DAD-EPG<br><br>FINDINGS AND RECOMMENDATIONS RECOMMENDING THAT THE MOTION TO DISMISS FOR LACK OF JURISDICTION BE DENIED AND THAT THE MOTION FOR LEAVE TO AMEND THE COMPLAINT BE GRANTED<br><br>**TWENTY-ONE DAY DEADLINE**<br><br>(ECF Nos. 7, 17, 27) |

Before the Court, on referral from District Judge Dale A. Drozd (ECF No. 23), are Defendant's Motion to Dismiss for Lack of Personal Jurisdiction (ECF No. 7) and Plaintiffs' Motion for Leave to Amend the Complaint to Add Jurisdictional Allegations (ECF No. 17). For the reasons discussed below, the Court recommends that Defendant's Motion to Dismiss for Lack of Personal Jurisdiction (ECF No. 7) be denied, and that Plaintiffs' Motion for Leave to Amend the Complaint to Add Jurisdictional Allegations (ECF No. 17) be granted.

## I. BACKGROUND

**A.** <u>Plaintiff's Original Complaint</u>

This is a product liability action brought by Plaintiffs, Rachel Berven and James Berven (collectively "the Bervens") against Defendant, LG Chem, Ltd. ("LG Chem"). According to the

1  Complaint (ECF No. 1), in November 2015, Ms. Berven went to Switch to Vapor, a retail store
2  located in California, and purchased an electronic cigarette ('e-cigarette" or "e-cig") and related
3  parts, including a replacement cylindrical battery manufactured by LG Chem—the LG 18650
4  lithium-ion battery ("18650 battery"). (ECF No. 1.) On February 25, 2016, Ms. Berven decided
5  to replace the battery in her e-cigarette. She removed the old battery, put the lithium-ion battery
6  that she had purchased from Switch to Vapor into her e-cigarette, put the e-cigarette up to her
7  mouth, and pressed the activation button. (*Id.* at 20-21.) The e-cigarette "suddenly *exploded*—
8  causing her hair, face, neck, shirt, pants, and thighs to catch on fire." (*Id.* at 21.) Ms. Berven's
9  resulting injuries include first, second, and third-degree burns to her face, neck, thighs, arm, and
10 hand; a fractured jaw; top and bottom lip split; and two teeth knocked out and another tooth
11 shattered in half. (*Id.*)

On February 23, 2018, the Bervens filed this product liability action against LG Chem in Stanislaus County Superior Court. The Complaint alleges that the explosion and Ms. Berven's resulting injuries were caused by the defective e-cigarette products, including the replacement battery manufactured by LG Chem. (*Id.* at 22.) The Complaint brings claims against LG Chem for strict product liability and negligent product liability.

On November 6, 2018, LG Chem removed the action to federal court based on diversity jurisdiction, and on November 9, 2018, LG Chem filed a motion to dismiss for lack of personal jurisdiction. (ECF No. 7.) On December 19, 2018, the Bervens moved for leave to file a first amended complaint ("proposed FAC" or "FAC") to add additional jurisdictional allegations against LG Chem. (ECF No. 17.) LG Chem opposes the motion to amend, arguing that leave to amend should be denied because the Bervens cannot meet their burden of establishing personal jurisdiction and that amendment would accordingly be futile. (ECF No. 21.)

**B.    Proposed First Amended Complaint**

The FAC alleges that the Court has specific personal jurisdiction over LG Chem because the incident occurred in California and LG Chem "has purposefully availed itself of the privileges and benefits of doing business in California." (ECF No. 17-1 at 6.) LG Chem "has past, present, ongoing, and continuing contacts with California by transacting substantial and

2

regular business in this state and manufacturing, distributing, and/or selling goods with the reasonable expectation and knowledge that they will be used in this state and which are in fact used in this state." (ECF No. 17-1 at 5-6.) The FAC includes the following additional allegations in support of personal jurisdiction:

> LG Chem is a global supplier of products, and touts its global reach, noting that LG "is literally the company leading the chemical industry in Korea. The company has built the *global network for production, sales and R&D* not only in Korea but also in main bases across the world and has provided globally competitive products including ABS, polarizers, and EV battery cells, raising its global position as a material supplier . . . LG Chem is committed to becoming a *global company*." LG also stresses that it is "the only chemistry-based company among global battery cell manufacturers, [which] has led the world lithium-ion battery market . . . positioned as a global leader . . . and has secured the battery production capacity as a global player . . . ."
>
> LG's Company Profile boasts that it is responsible for "manufacturing the first domestic Lithium-ion Battery that is leading the global market with superior technology and productivity." It lists as "major customers" such worldwide brands as LG Electronics, Apple (headquartered in Cupertino, CA), Dell, Hewlett Packard (headquartered in Palo Alto, CA), Bosch, Asus, Lenovo, Stanley Black&Decker, and others. And its most recent Annual Report discloses its drive that "we will become the undisputable top maker of lithium-ion batteries within the next few years."
>
> LG Chem sells its batteries to worldwide markets, utilizing distributors across the globe to ensure the reach of its battery products in all markets. This is particularly true in California, where LG has, upon information and belief, established particular lithium-ion battery distributors to which it ships large quantities of its cylindrical lithium-ion batteries. These batteries are then redistributed, sold, packaged, transported, or provided to end users in California and across the United States for use. The regular course and scope of LG Chem's batteries involves the shipping of huge quantities of its batteries, both the cylindrical lithium-ion battery at issue here, as well as LG Chem's other energy storage products, into and throughout California, and indeed the world. LG Chem's known California distributors—to which it directly ships thousands if not millions of battery products—include the following:
>
>     i. Energy Sales, headquartered at 1380 Borregas Ave., Sunnyvale, CA 94089, which states that it is a "value-added assembler and distributor specializing in the most widely accepted brands of batteries," and specifically lists LG Chem as one of its primary suppliers of battery cells for lithium-ion, lithium-polymer, and silver-oxide batteries.
>
>     ii. House of Batteries, headquartered at 19010 Talbert Ave., Fountain Valley, CA 92708. That company claims it is a "US-based supplier of LG Chem batteries."
>
>     iii. Based on information and belief, during at least the years 2013 to present, LG Chem supplied, sold, shipped, distributed and provided directly to consumers and distributors throughout the State of California, thousands (if not millions) of its products, including cylindrical lithium-ion batteries, which were sold for use, and used, in California. Based on information and belief, LG Chem marketed, advertised, targeted customers, and promoted the sale of its various products, including lithium-ion batteries, to numerous consumers and distributors throughout California. Upon information and belief, those distributors, and other distributors located throughout the United States and the world, in turn sold large quantities of products, including LG lithium-ion batteries to wholesalers and retailers located in California for direct sale to California consumers, where said

3

products were purchased by California residents and used in the State. Based on information and belief, LG's marketing, advertising, sale, distribution network, and provision of batteries to California resulted in the use of thousands, if not millions, of LG products, particularly cylindrical lithium-ion batteries, in the State of California—and comprising one of LG's primary distribution channels for its products.

In addition to the authorized LG Chem batteries shipped directly to California, LG Chem also engages, upon information and belief, in a grading process for the various batteries it manufactures. Upon information and belief, those batteries that fail to achieve a sufficient grade or conform appropriately to standards are not discarded. Instead, in the interests of profit, LG Chem sells those inferior or nonconforming lithium-ion battery products to other distributors, with LG knowing full well that they may be using those batteries for individual electronic or other uses—uses that may not be explicitly authorized, but are certainly permitted by LG Chem in the interest of maintaining its profitability. In addition, based upon information and belief, in the manufacturing process, LG Chem ends up with a significant quantity of batteries with cosmetic defects in the wrapper, without a wrapper at all, or with batteries with other types of cosmetic and other defects. Again, instead of discarding those batteries, LG Chem knowingly sells those substandard batteries to various distributors throughout the world to remove the cosmetically defective or missing wrapper, apply their own wrapping, and then sell those batteries for other uses. Those batteries are then sold to consumers throughout the world, and readily and rapidly reach California shores, all at the reasonable expectation or explicit knowledge of LG Chem. Based on these two avenues, LG Chem ultimately sells huge quantities of lithium-ion batteries that end up in the electronic cigarette market in California, and end up in the hands of California consumers, including upon information and belief, the battery at issue in this matter.

For at least the last six years, it has been well known in the electronic cigarette industry, and based upon information and belief, well known to LG Chem, that its lithium-ion batteries were being used in connection with electronic cigarettes and were even *recommended* by multiple online sources for e-cig use. For example, the following electronic cigarette stores located in California and selling LG Chem batteries advertise those batteries as follows:

   i. Vapor Authority – (located in San Diego) and website says: "LG is world renown as producing very high quality products, and their electronic cigarette batteries are not exception. Their extremely powerful 18650 e-cig batteries work wonderfully in virtually all devices. LG pays meticulous attention to quality, ensuring that their lithium-ion ecig batteries are made to be stable, consistent, and safe. If you're looking for a vape battery for your electronic cigarette device, you can't go wrong with LG."

   ii. Element Vape – (California) and website says: "LG HG2 18650 20A 3000mAh battery is a high quality and excellent battery that offers maximum discharge current at 20 Amp. It is great battery to use all the variable voltage/wattage and other mods/devices in the market."

   iii. Vape Craft (Vista, CA – note OUT OF STOCK): "LG HG2 18650 300mAh 20A is a great battery to use in your vape mod. Whether you are planning to use this LG battery in your vape, remote, flashlight, or whatever, this is a great battery to use. Please read up on general battery safety, especially if you are going to use this in an advanced mod/mech mod. We thank you for being safe. Get yours before we're out of stock again!"

. . .

Indeed, LG batteries are so widely available in California that *more than 20* of those

4

batteries have exploded in the hands of California consumers (and that is active litigation handled by Bentley & More LLP alone).

LG Chem's contacts with California also include significant actions that go far beyond merely placing batteries into the stream of commerce, with LG Chem directly delivering products, directly negotiating contracts, directly entering into sale and distribution agreements, or directly partnering with California business, entities, and other California residents:

i. First, LG Chem boasts that it "delivered and commissioned the largest battery system installed in North America" in 2014 in Tehachapi, CA, "including overall project and construction management, system engineering and design, and battery rack systems." "LG Chem demonstrated its system engineering capabilities and the modularity and flexibility of its battery solutions by designing, engineering, and installing the utility-scale battery system" in Tehachapi, CA, which included "604 battery racks, 10,872 battery modules, and 608,832 individual battery cells" of its automotive lithium-ion battery.

ii. Second, LG Chem has entered into direct contracts with (at least) three California utilities to provide Brackish Water Reverse Osmosis membranes, including for utilities located in Orange County, Silicon Valley, and Los Angeles County.

iii. LG Chem has partnered with California companies such as Sullivan Solar Power, SunRun, and Vivint Solar, Inc. to directly sell and install, in homes across California, LG Chem lithium-ion battery energy storage units—including choosing Carlsbad, California as the site of the first LG Chem residential energy storage unit in the continental United States. This partnering process included a "written certification test" for installers that was generated by LG Chem before it would approve the ability to install LG Chem's batteries in the homes of more than 200 Californians.

iv. LG Chem has invested directly into California companies, such as Enevate Corporation, which has its principal place of business at 101 Theory, Suit 200, Irvine, CA 92617. Enevate is a California-based firm that has done pioneering work in rapid charging of lithium-ion batteries, allowing them to be charged to 75 percent capacity in as little as 5 minutes, and received a "strategic investment from LG Chem," and entered a "strategic partnership[] with companies such as LG Chem . . . ."

v. In 2010, LG Chem applied for, and was selected, to provide lithium-ion battery packs for Southern California Edison's pilot program involving energy storage systems for residential and small commercial applications.

vi. LG Chem partnered with AES Energy Storage and supplied the necessary lithium-ion batteries to competitively bid for, and win, a Southern California Edison project to install a 100MW/300MWh battery to be installed in 2022 at the Alamitos Energy Centre storage project in Long Beach, California, which will supply electricity under a 20-year power purchase agreement with the utility.

vii. LG Chem engaged in the direct selling of lithium-ion batteries to automakers for use in electric vehicles, including supplying Tesla Motors (located in Silicon Valley, California) with battery cells for Tesla's Roadster "3.0" battery-pack upgrade. These involved the shipment of thousands of battery packs to Tesla under a direct contract. LG Chem also supplies lithium-ion cells to almost a dozen automakers among its other customers.

viii. LG Chem agreed to a massive $2.4 billion supply contract with Faraday Future, a company based in California with its principal business and executive offices located in Los Angeles, to supply cylindrical lithium-ion batteries, after working

5

closely with that company "to develop a tailored cell chemistry to optimize the range and safety of our mass production battery hardware," with teaser pictures closely resembling the 18650 cell at issue in this matter.

    ix. In the year 2013, LG Chem pled guilty and was forced to pay a $1.056 million criminal fine for charges relating to price fixing involving batter cells. The case against LG Chem related to a one-count felony charge brought against it by the U.S. Department of Justice in the Northern District of California. The charge was that LG Chem had conspired with another entity to fix the price of cylindrical lithium-ion battery cells used in notebook computer battery packs. Based upon information and belief, LG Chem has been the subject of numerous other lawsuits brought and litigated in California.

In addition to its global profile, global distribution network, and quest to be global leader in selling and distributing lithium-ion batteries, LG Chem operates a number of subsidiaries in the United States, and specifically in California:

    i. LG Chem America, Inc., is a direct, 100% owned and controlled subsidiary of LG Chem, and operates as one of the principal marketing, sales, and trading subsidiaries for LG Chem in the United States. Although its principal executive office is claimed to be at 3475 Piedmont Road NE, Suite 1200, Atlanta, GA 30305, LG Chem America has voluntarily designated a "principal business office in California" in its registration with the Secretary of State, designating 2540 N. First, #400, San Jose, CA 95131 as its principal business office in the State. LG Chem America transacts business in California, has a principal place of business in California, ships product to California, markets its products directly in California, and conducts regular, repeated business with California entities on behalf of its parent company, LG Chem.

    ii. LG Chem Michigan Inc. is a direct, 100% owned and controlled subsidiary of LG Chem and operates as one of LG Chem's principal manufacturing plants in the United States, specifically manufacturing LG Chem's lithium-ion batteries. Although its principal executive office is located in 1 LG Way, Holland, MI 49423, LG Chem Michigan has voluntarily designated a "principal business office in California" in its registration with the Secretary of State, designating 2540 N. 1st Street, Suite 300, San Jose, CA 95131 as its principal place of business in this state. LG Chem Michigan transacts business in California, has a principal place of business in California, ships product to California, markets its products directly in California, and conducts regular, repeated business with California entities on behalf of its parent company, LG Chem.

    iii. LG NanoH$_2$O, Inc. is the result of a California business that LG Chem acquired in or about 2014 at the cost of approximately $200 million. LG Chem sought out, purchased, and directly acquired and made its subsidiary the California corporation named NanoH$_2$O, Inc. That new corporation (LG NanoH$_2$O, Inc.) continued to operate in California, manufacturing products and conducting marketing on behalf of LG Chem. LG NanoH$_2$O is listed as a "marketing subsidiary" for LG Chem and operates as a direct subsidiary of the company, being 100% owned and controlled by LG Chem. LG NanoH$_2$O has both its principal executive office and its principal place of business the property located at 21250 Hawthorne Blvd., Suite 330, Torrance, CA 90503. That is the office LG Chem *still* continues to list as the principal place of business of its direct subsidiary. LG NanoH$_2$O transacts business in California, has a principal place of business in California, ships product to California, markets its products directly in California, and conducts regular, repeated business with California entities on behalf of its parent company, LG Chem.

    iv. Based upon information and belief, the actions of the subsidiaries in establishing

    principal places of business in California, transacting business in California, selling and marketing products to individuals in California, and having regular, repeated conduct with California should be imputed to LG Chem because LG Chem intended for its subsidiaries to serve as its marketing and production arms in the United States and to act on behalf of LG Chem (to which the subsidiaries, directly and wholly controlled by LG Chem agreed) and LG Chem exercised full, total, and explicit control of its direct subsidiaries in their conducting business in and through California. For example, based upon information and belief, employees of LG Chem, Ltd. and LG Chem America, Inc., used the "lgchem.com" domain name for their email addresses. Personnel regularly shifted between LG Chem and its subsidiaries, blurring the distinctions between the foreign parents and the U.S. subsidiaries.

  v. Based upon information and belief, LG Chem directs and controls the actions of its subsidiaries, including LG Chem America, LG Chem Michigan, and LG NanoH$_2$O, causing its subsidiaries to sell and ship products directly to California companies and consumers, to regularly place products into the stream of commerce *within* California as well as *from* California, as well as directing and controlling its subsidiaries to advertise, market, promote, and seek to develop further business with California businesses and California residents. LG Chem, through its direct actions and through the control of its subsidiaries: (a) transacted business in the United States, including in this District; (b) sold or marketed substantial quantities of Lithium Ion Batteries throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including this District; and (d) purposefully availed itself of the laws of the United States, and of California in particular.

In addition to the contacts of LG Chem and its subsidiaries with California, LG Chem has been repeatedly haled into court in California for the explosions of its cylindrical lithium-ion batteries. In the last three years, Plaintiff's counsel has brought or litigated more than 20 personal injury actions against LG due to the explosion of one of its 18650 lithium-ion batteries. Of those matters, in at least 7-10 LG Cham *voluntarily* accepted service of the summons and *voluntarily* consented to the personal jurisdiction of California for the injuries resulting from the explosion of its product. It used some of the *same* counsel it has retained in this matter (Lewis Birsboi Bisgaard & Smith LLP), and actively litigated those cases, serving and answering discovery, filing motions, attending mediations, and settling claims against it. In addition, based upon a docket review, LG Cham has been repeatedly named as a defendant in actions litigated throughout California, including in a series of antitrust class-action claims currently being litigated in the USDC – Northern California. LG Chem has been repeatedly, knowingly, and regularly haled into court in California state and federal courts.

(ECF No. 17-1 at 6-19 (citations omitted) (alterations and emphasis in original) (certain numbering altered during formatting).)

**C. <u>Motion to Dismiss</u>**

  LG Chem seeks dismissal of this action based on lack of personal jurisdiction. The Bervens oppose dismissal, contending that LG Chem is subject to personal jurisdiction under the "stream of commerce plus" test.

///

7

*Summary of Defendant's Argument*

LG Chem argues that it is not subject to personal jurisdiction in California. LG Chem explains that it is a Korean company that has never had an office in California, and has never been licensed to do business in California, and lacks the purposeful minimum contacts with California necessary to establish specific personal jurisdiction over it.

LG Chem does not dispute, for purposes of the motion to dismiss, that it manufactured the battery at issue in this case (the "Battery"), that the Battery is an LG 18650 lithium-ion battery ("18650 battery"),[1] and that LG Chem sells the same type of battery—the 18650 battery—in California through authorized distributors with the full support and marketing of LG Chem. LG Chem contends, however, that it is not subject to personal jurisdiction in California because (1) the Battery was not sold by an LG Chem authorized distributor in California, but instead reached California through an "unauthorized" distributor; (2) the Battery had been rewrapped into an "MXJO"[2] wrapper and this rewrapping was not authorized by LG Chem; and (3) the Battery was used in an unauthorized way—by an individual consumer in an e-cigarette.

LG Chem contends that it

> has not engaged in any purposeful business activities in or directed to the State of California related to the allegations at issue in the complaint. LG Chem does not design, manufacture, distribute, advertise, or sell 18650 lithium-ion power cells for use by individual consumers as replaceable, rechargeable batteries in electronic cigarette devices. Instead, LG Chem manufactures 18650 lithium-ion power cells for use in specific applications by sophisticated companies. . . . LG Chem has never authorized any manufacturer, wholesaler, distributor, retailer, or re-seller, including Switch to Vapor, to advertise, distribute, or sell LG 18650 lithium-ion power cells in California, or anywhere else, for use by individual consumers as replaceable batteries in e-cigarette devices.
>
> . . . .
>
> . . . . LG Chem never authorized Switch to Vapor to distribute or sell LG 18650 lithium-ion power cells for use by individual consumers as replaceable, rechargeable batteries in e-cigarette devices, including re-wrapped as MXJO batteries. . . . LG Chem did not authorize or approve the re-wrapping of the cell . . . .

(ECF No. 7 at 8, 13; *see* ECF No. 24.)

---

[1] The battery at issue is an LG HG2 18650 battery. During the hearing on the motion to dismiss and motion to amend, the parties referred to the battery as an LG HG2 battery, but in the proposed FAC and other pleadings, the battery primarily has been referred to as a 18650 battery. For purposes of consistency with the proposed FAC, the Court will refer to the type of battery as a 18650 battery.

[2] MXJO is apparently a Chinese company.

*Summary of Plaintiffs' Argument*

The Bervens oppose the motion to dismiss, and contend that the Court has specific personal jurisdiction over LG Chem under the stream of commerce plus test. (ECF No. 22.) The Bervens note that LG Chem manufactured the Battery and placed the Battery into the stream of commerce; and that the Battery was sold in California, used in California, exploded in California, and injured a California resident. Further, "LG Chem has a plethora of contacts that directly tie its activities to California, and show its intent to 'serve directly or indirectly, the market for its product' in California" as set out in the proposed FAC. (*Id.* at 6.) These activities include substantial sales of lithium-ion batteries—including 18650 batteries—in California by LG Chem through authorized distributors, and the marketing and support of those batteries by LG Chem. Further, the Bervens argue that it would be unfair to preclude the exercise of jurisdiction here merely because LG Chem sells its nonconforming and inferior batteries—such as the one at issue in this case—to "unauthorized" distributors, and that LG Chem should not be able to avoid the exercise of jurisdiction on such a basis.

## II. LEGAL STANDARDS

### A. Legal Standard for Motion to Dismiss

On a motion to dismiss for lack of personal jurisdiction brought pursuant to Fed. R. Civ. P. 12(b)(2), the plaintiff bears the burden of demonstrating that the court's exercise of jurisdiction is proper. *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1073 (9th Cir. 2011). When, as here, the court's determination is based on written materials rather than an evidentiary hearing, "the plaintiff need only make a prima facie showing of jurisdictional facts." *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008) (quotation marks and citation omitted).

In resolving the motion on written materials, the court must "only inquire into whether [the plaintiff's] pleadings and affidavits make a prima facie showing of personal jurisdiction." *Id.* (alteration in original) (quotation marks and citation omitted). "That is, the plaintiff need only demonstrate facts that if true would support jurisdiction over the defendant." *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995). Uncontroverted allegations in the complaint must

be taken as true. *Boschetto*, 539 F.3d at 1015. "Conflicts between the parties over statements contained in affidavits must be resolved in the plaintiff's favor." *Id.* (quoting *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004)). In addition, "[t]he court may consider evidence presented in affidavits to assist it in its determination and may order discovery on the jurisdictional issues." *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001). However, "conflicts between the facts contained in the parties' affidavits must be resolved in [plaintiff's] favor for purposes of deciding whether a prima facie case for personal jurisdiction exists." *AT & T v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996).

**B.     Legal Standard for Determining Personal Jurisdiction**

Federal courts generally follow state law in determining the bounds of their jurisdiction over persons. *See* Fed. R. Civ. P. 4(k)(1)(A). California's long-arm statute allows the exercise of personal jurisdiction to the full extent permissible under the U.S. Constitution. *See* Cal. Civ. Proc. Code Ann. § 410.10 (courts may exercise personal jurisdiction "on any basis not inconsistent with the Constitution of this state or of the United States"). Thus, the issue the Court must decide is whether the assertion of personal jurisdiction over LG Chem comports with the limits imposed by federal due process. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 464 (1985); *see also Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915 (2011) ("The Due Process Clause of the Fourteenth Amendment sets the outer boundaries of a state tribunal's authority to proceed against a defendant.").

Under the Due Process Clause, a court may exercise personal jurisdiction over a non-resident defendant only if the defendant has "certain minimum contacts . . . such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). This due process analysis focuses on whether a nonresident defendant's conduct and connection with the forum state are such that it should reasonably anticipate being haled into court there. *World–Wide Volkswagen Corp. v, Woodson*, 444 U.S. 286, 297 (1980). It is based on the presumption that it is reasonable to require a defendant to be subject to the burden of litigating in a state in which it conducts business and benefits from its activities in that state. *Brainerd v. Governors of the University of*

*Alberta*, 873 F.2d 1257, 1259 (9th Cir. 1989). This requirement is met if the contacts proximately result from actions by the defendant itself that create a substantial connection with the forum, such as where the defendant has deliberately engaged in significant activities within the forum or has created continuing obligations between itself and forum residents. *Burger King Corp*, 471 U.S. at 474-76. A defendant may not, however, be haled into a jurisdiction as a result of the defendant's random, fortuitous, or attenuated contacts with the forum, based on the unilateral activity of another party or a third person. *Id.* at 475.

There are two kinds of personal jurisdiction that a court may exercise over a foreign defendant—"general jurisdiction" and "specific jurisdiction." *Id.* at 919. General jurisdiction exists if the defendant's contacts with the forum are "so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities." *Int'l Shoe*, 326 U.S. at 318. Specific jurisdiction, on the other hand, exists where the litigation is derived from obligations that "arise out of or are connected with the [company's] activities within the state." *Id*. at 319.

Here, the Bervens do not contend that the Court has general jurisdiction over LG Chem. Rather, the Bervens contend that the Court has specific personal jurisdiction over LG Chem under the "stream of commerce" test.

A majority of the U.S. Supreme Court has not agreed on a stream of commerce test for specific personal jurisdiction. *See Asahi Metal Industry Co. v. Superior Court of California, Solano County*, 480 U.S. 102 (1987); *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873 (2011). However, the Ninth Circuit has adopted the "stream of commerce plus" test set forth in Justice O'Connor's concurrence in *Asahi*, 480 U.S. at 112. *See Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 459 (9th Cir. 2007) (applying the "stream of commerce plus" test set out by Justice O'Connor in *Asahi*).[3]

In *Asahi*, the underlying incident was a motorcycle accident in California that was alleged to have been the result of a defective motorcycle tire. Asahi, a Japanese company, manufactured

---

[3] The parties also agreed during the February 8, 2019, hearing that the stream of commerce plus test set out by Justice O'Connor in *Asahi* is the appropriate test for this Court to apply in determining whether LG Chem is subject to personal jurisdiction in California.

a component part of motorcycle tires and then sold that component part in Taiwan to a Taiwanese tire tube company, which then integrated the component part into tire tubes, including the tire tube that was on the motorcycle at issue in the case. The Taiwanese company was sued in California state court in a product liability action, and the Taiwanese company filed a cross-complaint against Asahi, seeking indemnification.

The California Supreme Court held that Asahi's awareness that its products would enter the stream of commerce and be sold in California was sufficient to establish personal jurisdiction. The U.S. Supreme Court disagreed and unanimously held that California did not have personal jurisdiction. However, none of the three opinions from the Court commanded a majority.

Justice O'Connor, writing for herself and three other justices, applied the following test, which has become known as the "stream of commerce plus" test:

> The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.

*Asahi*, 480 U.S. at 112.[4]

### III.   ANALYSIS OF PERSONAL JURISDICTION

Turning to the present case, the issue the Court must decide is whether LG Chem's contacts with California, as alleged in the First Amended Complaint, provide the "plus" needed

---

[4] The other two opinions in *Asahi* were authored by Justice Brennan and Justice Stevens. Justice Brennan, writing for himself and three other justices, concurred in the judgment but disagreed that a plaintiff needed to show that a defendant engaged in "additional conduct" directed toward the forum state before a court could exercise personal jurisdiction over a defendant. 480 U.S. at 116-17. "The stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale," such that a defendant who has participated "in this process is aware that the final product is being marketed in the forum State, [and] the possibility of a lawsuit there cannot come as a surprise." *Id*. at 117.

Justice Stevens, joined by two others, concurred in the judgment but disagreed that the Court needed to articulate any test under the circumstances beyond the factors set forth in *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980). Justice Stevens emphasized that whether Asahi's "conduct rises to the level of purposeful availment requires a constitutional determination that is affected by the volume, the value, and the hazardous character of the components." 480 U.S. at 121.

12

to satisfy the stream of commerce plus test for the assertion of personal jurisdiction.

LG Chem does not contest, for purposes of this motion, the plethora of contacts alleged in the amended complaint, including the substantial marketing, sales and support for 18650 batteries in California. Instead, LG Chem argues that such contacts should not be considered for specific jurisdiction because they concerned sales by authorized distributors who wrapped the product in an authorized way for use in an authorized manner. In contrast, LG Chem argues, the 18650 battery at issue in the complaint was sold through an unauthorized distributor and wrapped and used in an unauthorized manner.

The Court has not found any case addressing whether sales, marketing and contacts through "authorized" distributors should be considered in evaluating specific jurisdiction over sales of the same product through unauthorized distributors. LG Chem does not cite to any case supporting its argument that contacts regarding sales through authorized distributors should be excluded from such consideration. However, LG Chem argues that it would be unjust to subject it to personal jurisdiction over sales from unauthorized distributors who package and use a product in an unauthorized manner, no matter how extensively it markets and sells the same product through its authorized distributors.

To resolve this question, we turn to the stream of commerce plus test set forth by Justice O'Connor in *Asahi* in evaluating specific jurisdiction regarding the product at issue here. This test asks the Court to evaluate a defendant's additional contacts regarding the "product" in the forum state. *See Asahi*, 480 U.S. at 112 ("Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State."). Here, the Court finds that the "product" at issue is the battery, i.e., a cylindrical battery manufactured by LG Chem—the LG 18650 lithium-ion battery ("18650 battery"). When defined this way, it is clear that the allegations in Plaintiff's First Amended Complaint regarding LG Chem's support for such product qualifies as the "plus" needed to satisfy the stream of commerce plus test. *See*

13

1  *Asahi*, 480 U.S. at 112; *J. McIntyre*, 564 U.S. at 888-89.  Specifically, LG Chem has extensive
2  contacts with California in relation to sales of the 18650 battery including, among other things,
3  LG Chem's establishment of distribution networks in California to market and sell LG's
4  lithium-ion batteries, including 18650 batteries; LG Chem's sale and shipment of thousands if
5  not millions of lithium-ion batteries, including 18650 batteries, to California, for use, resale,
6  redistribution, packaging, transport, and provision to end users in California and across the
7  United States; LG Chem's marketing, promotion, and advertising of its lithium-ion batteries in
8  California, which targets both consumers and distributors in California; and LG Chem's
9  maintenance of an interactive informational website through which potential customers can
10 inquire about LG Chem batteries, including 18650 batteries, and receive prompt responses. (*See*
11 ECF No. 17-1 at 6-22 (jurisdictional allegations in proposed FAC).)  In other words, if the
12 "product" is defined as the battery at issue, LG Chem's acts of purposeful availment are more
13 than sufficient to provide the "plus" necessary for the stream of commerce plus test. *See Asahi*,
14 480 U.S. at 112 (listing additional conduct that may provide the necessary "plus" for the stream
15 of commerce plus test as including "advertising in the forum State, establishing channels for
16 providing regular advice to customers in the forum State, or marketing the product through a
17 distributor who has agreed to serve as the sales agent in the forum State"); *J. McIntyre*, 564 U.S.
18 at 888-89 (finding the "plus" required for the stream of commerce plus test to be missing where
19 there was "'no regular . . . flow' or 'regular course' of sales in [the forum]; and there [was] no
20 'something more,' such as special state-related design, advertising, advice, marketing, or
21 anything else").

22      In its attempt to exclude these substantial contacts from consideration, LG Chem argues
23 that the product should not be defined as the battery itself—rather it is a battery as distributed
24 and used a certain way.  Thus, in arguing that it does not have any contacts related to the
25 product in suit, Defendant states "LG Chem does not design, manufacture, distribute, advertise,
26 or sell 18650 lithium-ion power cells *for use by individual consumers as replaceable,*
27 *rechargeable batteries in electronic cigarette devices*. Instead, LG Chem manufactures 18650
28 lithium-ion power cells *for use in specific applications by sophisticated companies*." (ECF No.

7 at 8, 13; *see* ECF No. 24.) (emphasis added). But the Court does not agree with LG Chem's framing of the "product" as limited to a certain battery distributed in a certain way, for a certain use, in certain packaging. The method of distribution is not part of the definition of the product. Nor is the manner of use. When it comes to evaluating contacts for jurisdiction under case law, including *Asahi*'s stream of commerce plus test, the "product" is the product being sold, which, in the present case, is the 18650 battery.

This is not to say that the manner of packaging and use is irrelevant to this lawsuit. Certainly, whether the product was wrapped and/or used in an authorized manner will be relevant to the question of liability in this product liability action. But the question for personal jurisdiction is whether LG Chem placed this product in the stream of commerce with such additional contacts related to that product to fairly subject LG Chem to personal jurisdiction in California. Assuming such contacts exist, as the Court finds they do here, a defendant cannot avoid jurisdiction based on allegations that the product was mis-wrapped or mis-used. *See Prescott v. Slide Fire Solutions,* 341 F. Supp. 3d 1175 (D. Nevada 2018) (defendant subject to personal jurisdiction even though product was used for unintended purpose).

In deciding whether to consider contacts regarding products sold through authorized channels in the forum when evaluating personal jurisdiction for the same products sold through unauthorized channels, the Court is also mindful of the principles of fair play and substantial justice that underlie every personal jurisdiction analysis. *See Int'l Shoe*, 326 U.S. at 316 (court may exercise personal jurisdiction over non-resident defendant only if the defendant has "certain minimum contacts . . . such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice"). Here, Plaintiff has alleged that LG Chem sells 18650 batteries that meet quality standards to authorized distributors in California, but sells 18650 batteries that do not meet quality standards—i.e., the inferior or nonconforming batteries—to unauthorized distributors, knowing and expecting that these inferior or nonconforming batteries will reach the California market and be sold to individual consumers for use in California, including in e-cigarettes. Accepting these allegations as true for purposes of this motion to dismiss, allowing LG Chem to avoid jurisdiction regarding products sold

through unauthorized dealers would allow a defendant to enjoy all the advantages of the forum when selling safe products while avoiding jurisdiction to answer for its less safe products. Such a result does not comport with transitional notions of fair play and substantial justice.

The present case is also distinguishable from *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County*, 137 S. Ct. 1772 (2017), relied on by LG Chem. In *Bristol-Myers Squibb*, a group of plaintiffs consisting of both California residents and residents of other states filed an action in California state court alleging that a drug called Plavix damaged their health. The defendant, Bristol-Myers Squibb ("BMS"), which both manufactured and sold Plavix, challenged the California court's exercise of personal jurisdiction over it for purposes of the claims brought by the *nonresident* plaintiffs; BMS did not challenge the exercise of jurisdiction over it for purposes of claims brought by the California resident plaintiffs. *Id.* at 1778.[5]

The Supreme Court held that there was no personal jurisdiction over BMS for the claims asserted by the *nonresident plaintiffs*, noting: "What is needed—and what is missing here—is a connection between the forum and the specific claims at issue." *Id.*

> In order for a state court to exercise specific jurisdiction, "the suit" must "aris[e] out of or relat[e] to the defendant's contacts with the forum." In other words, there must be "an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation. For this reason, "specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction."

*Id*. at 1780 (citations omitted).

The Court went on to explain:

> As noted, the nonresidents were not prescribed Plavix in California, did not purchase Plavix in California, did not ingest Plavix in California, and were not injured by Plavix in California. The mere fact that *other* plaintiffs were prescribed, obtained, and ingested Plavix in California—and allegedly sustained the same injuries as did the nonresidents— does not allow the State to assert specific jurisdiction over the nonresidents' claims. As we have explained, "a defendant's relationship with a . . . third party, standing alone, is

---

[5] BMS was not incorporated in California, was not headquartered in California, and did not maintain operations in California. *Id*. at 1777-78. BMS did, however, engage in business activities in California, including having research and laboratory facilities, over 250 sales representatives, and a small state-government advocacy office in California. *Id.* at 1778. BMS also sold almost 187 million pills in California between 2006 and 2012, taking in more than $900 million from those sales, which was about one percent of BMS's nationwide sales revenue. *Id.* Further, although BMS manufactured and sold Plavix in California, it "did not develop Plavix in California, [did] not create a marketing strategy for Plavix in California, and did not manufacture, label, package, or work on the regulatory approval of the product in California." *Id.*

16

> an insufficient basis for jurisdiction." This remains true even when third parties (here, the plaintiffs who reside in California) can bring claims similar to those brought by the nonresidents. Nor is it sufficient—or even relevant—that [the defendant] conducted research in California on matters unrelated to Plavix. What is needed—and what is missing here—is a connection between the forum and the specific claims at issue.

*Id.* at 1781 (citing and quoting *Goodyear*, 564 U.S. at 919; *World-Wide Volkswagen*, 444 U.S. at 295).

In contrast to *Bristol-Myers Squibb*, in the present case, the individual injured by the product—Ms. Berven—is a resident of the forum, purchased the product in the forum, used the product in the forum, and was injured by the product in the forum. Thus, the present case has the exact type of connections between the claims and the forum that were missing in *Bristol-Myers Squibb*. *See id.* at 1781 (holding personal jurisdiction over defendant lacking for claims brought by plaintiffs who were not residents of the forum, did not purchase the product in the forum, did not ingest the product in the forum, and were not injured in the forum).

The present case is also distinguishable from *Holland America Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450 (9th Cir. 2007), also relied on by LG Chem. In *Holland America*, the underlying incident was an engine explosion on a cruise ship that then caused the ship to catch on fire, destroying the ship entirely and causing it to sink while on a voyage near Tahiti. Holland America, the operator of the cruise ship, brought an action in federal court in Washington against numerous defendants, including a Finnish entity that Plaintiff alleged either designed, manufactured, or sold a faulty engine part that contributed to the engine explosion. *Id.* at 454. The Ninth Circuit found allegations that the Finnish entity had placed the allegedly faulty engine part into the stream of commerce to be insufficient to establish personal jurisdiction:

> The placement of a product into the stream of commerce, without more, is not an act purposefully directed toward a forum state. Even a defendant's awareness that the stream of commerce may or will sweep the product into the forum state does not convert the mere act of placing the product into the stream of commerce into an act purposefully directed toward the forum state.

*Id.* at 459 (citing *Asahi*, 480 U.S. at 112). That the Finnish entity may have sent representatives to various industry trade shows in Washington and maintained an "entirely passive website" and

17

advertisements in publications that may have made their way to Washington, was also insufficient to demonstrate that the Finnish entity purposefully availed itself of the Washington market. *Id.*

Finally, there was no nexus between the forum and Holland America's claim:

> The injury occurred in Tahiti, not Washington. The engine that blew up was manufactured in France, with no connection to Washington. And even if the claim stems [from the allegedly faulty engine part], Holland America offered no specific allegations as to when or where [that part] was purchased or installed: it has alleged only that [the Finnish entity] once mailed to Seattle a replacement part for one of the [destroyed ship's] sister ships.

*Id.* at 460-61.

In the present case, unlike the Finnish entity in *Holland America,* LG Chem has extensive contacts with the forum regarding the product, as discussed above, including establishing distributors in California through which there is a "regular flow" or "regular course" of sales in California of LG Chem lithium-ion batteries, including 18650 batteries; advertising and marketing in California targeted to both consumers and distributors; and maintaining an informational and interactive website through which LG Chem records and stores information about potential customers, and potential customers can inquire about LG Chem's lithium-ion batteries (including 18650 batteries) and receive prompt replies to those inquiries. Further, unlike *Holland America*, here there is a direct nexus between the forum and the Bervens' claims: the Battery was purchased in California from a California retailer, the Battery was used in and exploded in California, and the injury occurred in California and to a California resident. *See Holland America*, 485 F.3d at 460-61 (finding nexus lacking where the product blew up and the injury occurred outside the forum, and there was no allegation that the product was purchased in or shipped to the forum).[6]

In sum, given that LG Chem placed the product in the stream of commerce, the individual injured by the product is a resident of California and purchased the product, used the

---

[6] The Court has considered and finds inapposite additional cases cited by LG Chem in support of its assertion that personal jurisdiction is lacking. In one of those cases, *Death v. Mabry*, 2018 WL 6571148 (W.D. Wash. Dec. 13, 2018), the district court held that personal jurisdiction over LG Chem was lacking in a case alleging an incident similar to the one at issue in the present case, but where LG Chem did not have any contacts or conduct tying it to the forum state. Thus, although LG Chem placed the battery at issue in *Death* into the stream of commerce, LG Chem did not have contacts with the forum—Washington—sufficient to supply the "plus" needed to satisfy the "stream of commerce plus" test. *See id.* at *3-*5.

18

product, and was injured by the product in California, the Court finds that the very substantial contacts of LG Chem in marketing and selling this battery in California through many authorized distributors provide the "plus" necessary to meet the "stream of commerce plus" test, and that the exercise of personal jurisdiction over LG Chem is accordingly appropriate and does not violate the Due Process Clause.

## IV. LEAVE TO AMEND

Leave to amend a complaint under Federal Rule of Civil Procedure 15 "shall be freely given when justice so requires." *Carvalho v. Equifax Info. Svs.*, LLC, 629 F.3d 876, 892 (9th Cir. 2010) (citing *Foman v. Davis,* 371 U.S. 178, 182 (1962)). The Supreme Court has instructed lower courts to heed carefully the command of Rule 15. *See Foman*, 371 U.S. at 182. As the Supreme Court has stated:

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowing the amendment, futility of the amendment, etc.—the leave sought should, as the rules require, be "freely given."

*Foman*, 371 U.S. at 182. "Absent prejudice, or a strong showing of any of the remaining *Foman* factors, there exists a presumption under Rule 15(a) in favor of granting leave to amend." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

As noted previously, LG Chem opposes the motion for leave to amend only because amendment would be futile because the Court lacks personal jurisdiction over LG Chem. Because the Court recommends finding that it has personal jurisdiction based in part on the allegations made in the proposed amended complaint, the Court finds that amendment would not be futile. Accordingly, leave to amend the complaint should be granted.

## V. CONCLUSION AND RECOMMENDATIONS

Based on the foregoing, the Court finds that the exercise of personal jurisdiction over LG Chem is appropriate, and that leave to amend the complaint should be granted. Accordingly, the Court recommends:

1. That Defendant's Motion to Dismiss for Lack of Jurisdiction (ECF No. 7) be DENIED;

2. That Plaintiff's Motion for Leave to Amend the Complaint (ECF No. 17) be GRANTED;

3. That Plaintiff be DIRECTED to file its First Amended Complaint (*see* ECF No.17-1); and

4. That Defendant's Request for Leave to Submit Brief Statement of Supplemental Authority (ECF No. 27) be GRANTED.

These findings and recommendations are submitted to the district judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within **twenty-one days** after being served with these findings and recommendations, the parties may file written objections with the court. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."

The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014) (quoting *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: **April 18, 2019**   /s/ Erica P. Grosjean
UNITED STATES MAGISTRATE JUDGE